STATE of Iowa, Plaintiff-Appellee,

v.

Roger Gene VAN HOFF,
Defendant-Appellant.

No. 83–1457.

Court of Appeals of Iowa.

April 30, 1985.

Charles L. Harrington, Appellate Defender, and Raymond E. Rogers, Asst. Appellate Defender, for defendant-appellant.

Thomas J. Miller, Atty. Gen., and Mary Jane Blink, Asst. Atty. Gen., for plaintiff-appellee.

Heard by DONIELSON, P.J., and SNELL and SCHLEGEL, JJ.

DONIELSON, Presiding Judge.

The defendant in this action, Roger Van Hoff, was convicted and sentenced for two counts of first-degree murder for the deaths of his father and one of his sons. On appeal, three arguments are raised for this court's consideration: 1) that the trial court erred in denying defendant's motion to suppress a blue notebook allegedly seized in violation of the fourth amendment; 2) that the defendant's eight-year-old son was not competent to testify at trial; and 3) that the trial court erred in

denying the defendant's request for surrebuttal and his motion for mistrial after the prosecutor allegedly misstated the evidence and argued a new theory of evidence during closing argument. We affirm.

## I.

Prior to trial, the defendant moved for suppression of a blue notebook on the grounds that it was seized in violation of the fourth amendment. The evidence presented at the suppression hearing indicated that while defendant was in jail *he asked the sheriff to go to his home, pick up certain items* and bring them back to him. The sheriff went to the defendant's home and found Rania Green there. Rania had moved out of the defendant's home the day before the murders and she had returned to collect her personal belongings. The sheriff asked Rania to help him locate the items. Rania found the blue spiral notebook that the defendant wanted. She leafed through the pages and came across a page with a handwritten paragraph that appeared to be a threat to the man that Rania had moved in with after leaving the defendant. Rania showed this to the sheriff who seized it as evidence.

The trial court ruled that the defendant had no expectation of privacy in the notebook, that the evidence was in plain view, and that the defendant consented to the search and seizure. The defendant's motion to suppress was overruled. Later at trial, over the defendant's renewed objections, the notebook was admitted into evidence.

The defendant argues in his first assignment of error that the blue notebook should not have been admitted into evidence because it was the product of a warrantless search in violation of the fourth amendment. In considering the defendant's constitutional claim, we make an independent evaluation of the totality of the circumstances. *State v. Cuevas*, 322 N.W.2d 910, 911 (Iowa Ct.App.1982). In doing so, we conclude that there has been no constitutional infringement.

■ The applicability of the fourth amendment depends upon whether "the person invoking its protection can claim a 'justifiable,' a 'reasonable,' or a 'legitimate expectation of privacy' that has been invaded by government action." *Smith v. Maryland*, 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220, 226 (1979). In *Katz v. United States*, Justice Harlan suggested that an expectation of privacy is "justifiable" if an individual has exhibited a subjective expectation of privacy and the expectation is one that "society is prepared to recognize as 'reasonable.'" 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576, 588 (1967) (Harlan, J., concurring). The Court has consistently emphasized the latter of these two requirements. *Hudson v. Palmer*, —— U.S. ——, ——, 104 S.Ct. 3194, 3199, 82 L.Ed.2d 393, 402 n. 7 (1984).

In *Hudson*, the Supreme Court had an opportunity to apply these principles and consider whether a prisoner had an expectation of privacy in a prison cell. The *Hudson* court stated,

Notwithstanding our caution in approaching claims that the fourth amendment is inapplicable in a given context, we hold that society is not prepared to recognize as legitimate any subjective expectation of privacy that a prisoner might have in his prison cell and that, accordingly, the fourth amendment proscription against unreasonable searches does not apply within the confines of a prison cell.

—— U.S. at ——, 104 S.Ct. at 3200, 82 L.Ed.2d at 402–03 (1984). The defendant in this action argues that the principles of *Hudson* are not applicable to the present case since the alleged invasion of privacy took place in a private home rather than a prison cell. We are unpersuaded by this argument.

■ The controlling factor in this case is that the defendant specifically requested that the sheriff bring the blue notebook to his jail cell. As the State indicates, if a person has no expectation of privacy in items in his jail cell, it follows that he can have no reasonable expectation of privacy

in an item which he has requested a law enforcement officer bring to him in the jail cell. As long as a prisoner has specifically requested an item, it makes little difference where the item is inspected. Any expectation of privacy ceases to exist at the time the request is made. It is less than realistic and bordering on absurd to suggest that a jailed suspect could ask a sheriff who is investigating a double murder to go to his house, secure important and relevant evidence, and still be able to claim an expectation of privacy in the items requested.

We therefore conclude that the search of the blue notebook did not violate the fourth amendment and it was properly admitted into evidence. The defendant did not have the reasonable expectation of privacy which is necessary to invoke the fourth amendment protections.

## II.

The defendant also claims that the trial court abused its discretion in ruling that the defendant's eight-year-old son, Michael, was competent to testify.

■ Iowa Rule of Evidence 601 provides, "[e]very person of sufficient capacity to understand the obligation of an oath or affirmation is competent to be a witness except as otherwise provided in these rules." The competency of a witness to testify has two aspects: (1) the mental capacity to understand the nature of the questions put and to form and communicate intelligent answers thereto and (2) the moral responsibility to speak the truth, which is the essence of the nature and obligation of an oath." [1] *State v. Harvey*, 242 N.W.2d 330, 336 (Iowa 1976). The ultimate determination of competency is within the discretion of the trial court. *Calvert v. State*, 310 N.W.2d 185, 186–87 (Iowa 1981).

■ In examining the record, we cannot say the court abused its discretion in permitting Michael to testify. Prior to trial,

the defendant challenged the competency of his son to testify. A competency hearing was held and Michael was questioned by defense counsel, the prosecutor, and the trial court. It is apparent from the transcript of this proceeding that Michael had some difficulty when asked generalized questions concerning truth and lies. However, when asked more specific questions, he was able to demonstrate his understanding of these concepts and the importance of telling the truth:

MR. RAMEY: What the Judge needs to know is if you know the difference between the truth and telling a lie.

What if I said you had two sisters; that you had a sister named Barbara. Would that be right?

THE WITNESS: No.

MR. RAMEY: Would that be a lie then?

THE WITNESS: Yeah.

MR. RAMEY: And if somebody asked you how many sisters you had, like the Judge did, you told him you had one sister. That is the truth; isn't it?

You have to answer yes or no.

THE WITNESS: Yes.

MR. RAMEY: And if you were asked to come to Court and tell the Judge and other people what happened at any time and the Judge said to you to promise to tell the truth, would you do that?

THE WITNESS: Yes.

MR. RAMEY: So then if somebody said you had two sisters, what would you tell them?

THE WITNESS: That was a lie.

     \*    \*    \*    \*    \*    \*

THE COURT: I used to have a friend of mine, and he would take home his schoolwork and he wouldn't do it at night like he was supposed to. Have you ever done that?

THE WITNESS: No.

THE COURT: He did it. When he went to school in the morning, he would

---

1. Prior to the enactment of the Iowa Rules of Evidence, witness competency was dealt with in Iowa Code § 622.1 (1981). As the trial court

concluded, the new rule does not change the applicability of the two-part test.

get to school and the teacher would say, "Do you have your homework? Did you do your homework?" He said, "Yes. I did it, but when I was walking across the bridge, the wind blew it out of my hand, and that is why I didn't have it."

What was he doing when he said that?

THE WITNESS: Lying.

THE COURT: Have you ever done anything like that?

THE WITNESS: Nope.

THE COURT: What would be the truth if the teacher asked him, "Do you have your homework?" What would be the truth about that friend of mine?

THE WITNESS: Saying no.

THE COURT: Pardon me.

THE WITNESS: Saying no.

THE COURT: And what do you think would happen if he lied?

THE WITNESS: I don't know.

THE COURT: Do you think he would be punished?

THE WITNESS: Uh-huh.

\*  \*  \*  \*  \*  \*

MR. RAMEY: If I said he was a fireman, what would you tell me?

THE WITNESS: No.

MR. RAMEY: No matter how many times I told you he was a fireman, you would tell me I was wrong; wouldn't you?

THE WITNESS: Yes.

MR. RAMEY: Because I would be wrong.

THE WITNESS: Uh-huh.

MR. RAMEY: So if people tell you something that is wrong, you still know to tell them the truth; don't you?

THE WITNESS: Yes.

MR. RAMEY: You were playing a game with the Chief of Police out in the hallway a while ago about making him tell us colors; weren't you?

THE WITNESS: Yep.

MR. RAMEY: What if I told you that that is a red shirt you have got on; what would you tell me?

THE WITNESS: No.

MR. RAMEY: 'Cuz that would be a lie.

THE WITNESS: Yep.

■■■ We believe this testimony adequately demonstrates Michael's competency to testify at trial. The defendant stresses the fact that Michael testified that he had never told a lie and that he could hit a baseball to the moon. It is claimed that these "obviously false answers" show that Michael has little or no grasp of the concept of truth. We disagree. As counsel indicated at the competency hearing:

Like most children, he will say that he can hit a baseball a mile, but then that is a question of whether or not Michael has a conception of how far a mile is or how far away the moon is.

In the mind of an eight-year-old, a baseball that sails into the sky may appear to have gone "almost to the moon." The fact that a child may perceive things differently would certainly be a relevant consideration for assessing credibility. Likewise, the inconsistencies in testimony which defendant points out would also be relevant in this respect. Yet these factors do not detract from a finding of competency. Finding no error, we affirm the trial court's determination of competency.

III.

The defendant's final argument is that the trial court erred in denying his request for surrebuttal. He asserts that the prosecutor asserted a new theory in rebuttal and also misstated the record. Defendant contends that the only remedy that would have cured this misconduct was to allow surrebuttal.

Our analysis of these claims necessitates a brief review of the evidence. At trial, the evidence indicated that the defendant was upset over the fact that Rania Green had moved out of his home. The day after she moved out, Rania returned to pick up her personal belongings. The defendant chased her out of the house with a knife, caught her outside and held her by the hair and throat. Rania managed to escape and ran to a friend's house.

Michael Van Hoff testified that after Rania fled, the defendant entered the home and loaded a gun. The defendant aimed the gun at Michael and his sister, Lori, and fired one shot. The children ran outside and down the street. The defendant then shot at his son, Corey, who was standing outside. Corey began running but was killed by another shot fired by the defendant. Several witnesses heard the shots and saw Corey fall. Then the defendant re-entered the home. At this point several witnesses saw the defendant's father out on the front stoop. Another shot was heard, the elder Van Hoff fell to the ground, and the defendant appeared at the front door holding a gun. While the precise sequence of events is disputed, at some point the defendant yelled to Michael and Lori to come back. They ran to Corey's body but fled after neighbors yelled for them to do so.

Essentially, the evidence reflects that a total of four shots were fired. Because the defendant's twelve-gauge shotgun held only three rounds, it is apparent that at some point between killing his son, Corey, and his father, Clarence, the defendant reloaded the gun.

In closing arguments, the prosecutor argued that the two shells remaining in the gun were intended for Michael and Lori since the defendant had called for them to come back:

It is the very same reason, I think, you can conclude that he was calling—that he was calling the other—You can conclude that he was calling to the other children to come back. *He still had two live rounds in that gun.* He still had two live children running in the street.

"Mike, Lori, come on back here. Come on back here."

Mikey, that little boy, went back far enough to check on Corey. Corey was dead. Flaherty was standing across the street telling him to get out of there. Mike ran to the neighbor's house and asked the woman to call the police.

(emphasis added).

Defense counsel contended that the defendant did not intend to kill the children since he did not fire at them when they stopped at Corey's body. During rebuttal, the prosecutor responded to the defense argument in the following fashion:

Mr. Sandre raised the question about those last two shots. How come he didn't shoot Mike when Mike came running back? Mr. Sandre's recollection of the evidence and my recollection of the evidence will differ. Your recollection of the evidence, you will have to discuss that in the jury room.

*But it seems to me, ladies and gentlemen, the gun was empty when Mikey came running back to check Corey.* That is why Roger went in the house and loaded it again. Because, I think, the witnesses it seems to me, the sequence if we put it together, maybe if we put it together, it is solely my recollection there were two shots and then Corey went running back, and at that time, Roger was on the front steps.

(emphasis added).

At the close of rebuttal, defendant requested surrebuttal on the ground that the prosecutor's rebuttal argument constituted a misstatement of the record and a different theory of evidence than previously asserted. The motion was denied. The trial court subsequently denied the defendant's motion for mistrial on the same grounds.

We first consider defendant's claim that counsel's statements in rebuttal constituted prejudicial misconduct since he misstated the record.

The standard governing the scope of closing arguments was stated in *State v. Phillips,* 226 N.W.2d 16, 19 (Iowa 1975):

Counsel is entitled to some latitude during closing argument in analyzing the evidence admitted in the trial. He may draw conclusions and argue all permissible inferences which may reasonably flow from the record which do not misstate the facts.

Of course, counsel has no right to create evidence by his argument nor interject his personal beliefs. It is for the

jury to determine the logic and weight of the conclusions drawn.

■ Applying this standard, we conclude that the prosecutor was merely drawing permissible inferences supported by the record. It is entirely possible that the defendant's gun was empty when he called for Michael and Lori to come back. Since Clarence was killed with the fourth bullet, the determinative factor is when he was shot. The defendant's gun only held three rounds, so he must have reloaded it prior to killing Clarence. A reasonable inference from the evidence is that Clarence was not shot until after the children had been called. Michael did not see Clarence get shot. Because of this, it may be inferred that he was shot while Michael was running away after he had checked Corey. Thus, the gun could have been reloaded while Michael was checking his brother. We are aware that there is some testimony which is inconsistent with this theory. One witness testified that Michael ran back to check Corey *after* Clarence was shot and therefore after the gun had been reloaded. This would likely affect the weight a jury would give the prosecutor's theory. However, the mere fact that the prosecutor's statement was inconsistent with one witness's testimony does not mean he misstated the record. A theory asserted during closing arguments need not be consistent with all evidence in the record. It is sufficient if the inference reasonably flows from the record. Since this standard was met, we conclude that there was no prosecutorial misconduct.

The defendant's final claim is that surrebuttal should have been allowed since the prosecutor asserted a different theory of the case during rebuttal.

There is no question that the prosecution did in fact assert inconsistent theories. During his closing argument, he initially stated that the defendant still had two live rounds in the gun when he called his children to come back; during rebuttal, he stated that the gun was empty at the time. While we do not approve of this practice,

we cannot say that it constitutes reversible error.

■ ▪ First, contrary to defendant's assertions, we believe the record reveals that the prosecutor's remarks were confined to "a response to the arguments of the defendant's counsel." Iowa R.Crim.P. 18(1)(b). In fact, the prosecutor prefaced his remarks by saying, "Mr. Sandre raised the question about those last two shots." Since the rebuttal argument did not exceed the scope of Rule 18(1)(b), it was within the trial court's discretion to deny surrebuttal. *See State v. Leek*, 152 Iowa 12, 17, 130 N.W. 1062, 1064–65 (1911).

■ We also cannot agree with defendant's contention that the assertion of two theories constituted misconduct which could only be remedied by allowing surrebuttal. Arguments by counsel are not evidence and have a limited effect. *State v. Robert*, 255 Iowa 166, 170, 121 N.W.2d 513, 515 (1963). At worst, the jury was presented with three different theories during arguments, any of which could be accepted or rejected. Thus, even assuming the prosecutor's conduct was improper, we cannot say that but for counsel's error, the result of the proceeding would have been different. *See State v. Nunn*, 356 N.W.2d 601, 606 (Iowa Ct.App.1984). Furthermore, the defendant had an opportunity to thoroughly explain his position during closing argument. While surrebuttal could have been used to point out the State's inconsistent theories, it is unlikely this would have affected the outcome of the case.

Finding no error, we affirm the conviction.

AFFIRMED.